CAMPBELL, Judge.
In this capital sexual battery case, the state challenges the pretrial order that excluded the two child victims’ hearsay statements. We reverse because we find that the trial judge clearly abused her discretion when she found that the time, content and circumstances of the children’s statements did not provide sufficient safeguards of reliability under section 90.803(23), Florida Statutes (1991).
Appellee, Kathy Grego, is the mother of Frankie and Rosemary, the two children she is accused of sexually abusing. It is their statements that are at issue. The statements were made during the course of an abuse investigation that was begun when HRS received a report from Rosemary’s foster mother in October of 1991, indicating the existence of sexual abuse. The HRS child abuse investigator indicated that as of that October 1991 date, the children were already in HRS care because of previous sexual abuse allegations. At the time the statements were made, Frankie was eleven and Rosemary was nine. Rosemary made four out-of-court statements and Frankie made three out-of-court statements.
Rosemary’s statements are substantially as follows:
Statement (1): On November 1, 1991, Rosemary was interviewed by Janet Reading-Lutz, Ph.D., at HRS offices. Dr. Lutz testified that Rosemary said she began having sex with Frankie, her brother, when she was five or six. She reported no abuse by her parents.
Statements (2) and (3): On November 14, 1991 and December 13, 1991, Rosemary was interviewed by Detective Frank Puglia and HRS investigator Terry Panko-Harris at her foster home. Panko-Harris did the interview while Puglia took notes. The first interview was in response to an October 30 abuse report filed with HRS by the foster mother, who reported that Rosemary had told her that she had been having sex with Frankie; the second interview, on December 13, 1991, was in response to a December 7 abuse report, again filed with HRS by Rosemary’s foster mother, this time reporting *745 that Rosemary had told her that she had been having sex with her parents.
Panko-Harris testified that during the first interview, after she built a rapport with Rosemary, Rosemary said that she had had sex with Frankie and that she thought something had happened with her parents, but could not remember. Rosemary was described as reluctant to “look up” or make eye contact and as being very, very nervous.
At the second interview with Rosemary, Panko-Harris said she also spoke briefly with the foster mother, who said that the child was talking again about her involvement with her parents and wanted to tell someone about it now. Rosemary told Pan-ko-Harris that she slept in her parents’ bed and watched dirty movies with them, that she and her mother engaged in oral and digital sex, that she and her father engaged in oral sex and that her parents told her to keep it a secret. Panko-Harris testified that, as a rule, she did not videotape or tape record such testimony because to do so would be intimidating to the child.
Statement (4): On December 10, 1991, Rosemary was interviewed by Detectives Puglia and Linda Hilliard at the Pinellas County Sheriffs Department “Love Room” (a room supplied with anatomically correct dolls for such interviews). Rosemary told them, “Frankie touched me where I pee with what he pees with.” She also stated that she had had sex with her father and that her mother had shown Frankie how to make love. She also stated that her mother had “touched her.”
Frankie’s three out-of-court statements were as follows:
Statement (1): On November 1, 1991, Dr. Lutz interviewed him at HRS offices. Frankie stated that while he did not think his father had ever touched him, he could not remember if his mother ever did. However, he indicated emphatically that he had experienced no inappropriate touching from other adults. He had watched videos with his father and siblings of men and women “going up and down on each other.” He confirmed having sex with his sister which began before they started watching the videos together, when he was eight and Rosemary was five or six. His younger brother and sister had also had sexual relations, and he had had sex with his younger sister as well.
Statement (2): On November 13, 1991, Frankie was interviewed by Panko-Harris and HRS Counselor Cecilia Quinn in the psychiatric ward of Morton Plant Hospital, where he was being treated for depression and attempted suicide. They interviewed him because they had received the October 30 report from Rosemary’s foster mother indicating that Rosemary and Frankie had been having sex with each other. He stated that he had been having sex with his brothers and sisters for a long time. He could not remember sex with his parents, stated that something must have happened, but he was not sure. He then stopped talking and began picking his skin.
Statement (3): On December 13, 1991, Frankie was interviewed by Panko-Harris and Puglia at his foster home. This interview was in response to Rosemary’s December 7 report to her foster mother. Although he was still having “blank spots,” he remembered watching x-rated movies by accident because they were mixed up with other tapes. He stated initially that he knew that something happened, but was unable to “bring it to his memory.” He then stated that his relationship with his mother was “real close.” He remembered sleeping with his mother, but could not remember anything sexual with his mother. He could not remember his parents having sex. He did remember having sex with Rosemary, stating, “I died,” and threw a blanket over his head. When asked about his relationship with his mother, he stated that he and his mother had gotten too close, that they did not have a normal relationship, that they made love and that his mother had taught him how to make love. He stated that this had happened often from the time he was six or eight years of age.
Under section 90.803(23), an out-of-court statement of a child victim eleven or younger describing any act of sexual abuse is admissible if the trial judge finds, in a separate hearing, that the time, content and cir- *746 cumstanees of the statement provide sufficient safeguards of reliability.
Based on the testimony presented at the hearing, the trial judge here decided to exclude the children’s statements, finding them unreliable because: (1) They lacked spontaneity; (2) the children delayed reporting the events; (3) the children’s descriptions of events were not consistent, child-like or age-appropriate; (4) the children remembered different things at different times; and (5) the methods used to obtain the statements were not conducive to reliable results. Our review of the record does not support these findings. We will address the findings in order.
First, the trial judge found that the children’s statements were not spontaneous because they were made in response to questions by adults, were made in stressful environments, were made after events in which the children had incurred the displeasure of their caretakers, especially Rosemary, and because both children were squirmy and fidgeting in their depositions.
Although the children’s statements were in response to questions by adiilts, the record provides no reason to suspect that the questioners planted ideas in the children’s heads or coerced them to say things that were not true. Even if the questions were leading, the United States Supreme Court has specifically declined to find the presence of leading questions to be proof of the statements’ unreliability. Idaho v. Wright, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990).
Neither does the fact that the statements were made in response to questions by adults, make the statements suspect. HRS investigator Panko-Harris’ two interviews of both children were the direct result of two reports from Rosemary’s foster mother. The foster mother had encountered excessive masturbation by the child, asked the child about it, and received responses from the child that she had had sex with her brother (the first HRS report), and her parents (the second HRS report). It was Rosemary’s peculiar behavior that spurred the foster mother to take the matter to HRS.
AlS to the trial judge’s finding that the statements had been made after incurring the displeasure of their caretakers (foster parents), the record offers no support for this finding. While Rosemary’s foster mother had explained to her that Panko-Harris would be coming to talk to her, there is no indication that Rosemary had incurred the foster mother’s displeasure. The foster mother said she questioned Rosemary for about five minutes. Although the trial judge also found that both children “regularly sought the approval of adults,” without more in the record, this appears to be merely normal childhood behavior.
As to the trial judge’s finding that the interviews occurred in stressful environments, while it is true that both Rosemary and Frankie were interviewed at HRS offices, that Rosemary was interviewed once in the sheriff’s department’s “Love Room,” and that Frankie was interviewed once at Morton Plant Hospital, the more detailed and incriminating testimony was not obtained in those interviews; rather, both children’s more incriminating statements were given during the three separate less stressful foster home interviews. Indeed Frankie and Rosemary, in separate foster home interviews, reported essentially identical facts. The interview of Frankie at the hospital had to occur there because when the first HRS report came in from Rosemary’s foster mother indicating that Rosemary had had sex with Frankie, Frankie was at the hospital for treatment of depression following a suicide attempt, and had been there for twenty-one days. Given the fact that both children reported the abuse in the nonstressful environments of their foster homes, we conclude that the interviews that were conducted in the so-called stressful environments did not taint the statements given in the nonstressful environments.
The trial judge also found it significant that the children were squirming and fidgeting during their depositions. However, that would be expected under the circumstances. Moreover, this behavior occurred during videotaped depositions that were not at issue. Not insignificantly, the squirming also tends *747 to support Panko-Harris’ belief that videotaping of children intimidates them.
The trial judge was also concerned because the children had delayed reporting the abuse for twenty months. However, the record points to some possible reasons for this delay. These children had described their engagement in abnormal sexual behavior with each other, with their parents and with their two younger siblings for years. Their perception of normal behavior was most certainly skewed. Frankie remembered having relations with Rosemary from the time he was eight, and Rosemary recalled familial sexual experiences beginning when she was five. If so, this had become their way of life. Apparently, neither child realized that such behavior is socially unacceptable. Frankie’s foster mother said that Frankie masturbated in front of company, and Dr. Kelly said that Frankie did not exhibit any modesty or embarrassment upon getting an erection during a physical exam. She said this was unusual for a boy his age. Indeed, it was Rosemary’s excessive masturbation that spurred the investigation and these proceedings.
Perhaps most importantly, however, the record reveals that both children had severe psychological problems. Both children exhibited severe developmental delays, self-mutilating behavior typical only of severely retarded children, frequent and open masturbation, and Frankie had attempted suicide. Also, there was evidence that both children had been told by their parents to keep their secret. Under these extremely unusual circumstances, the delay in reporting does not carry as much weight as it would under more typical circumstances.
Additionally, the trial judge found that the children’s terminology was not age-appropriate or child-like. Certainly, however, the children’s use of adult, sexual slang would be expected in a home where all members engage in sexual relations together, watch pornographic videotapes together in the parents’ bed and watch each other engage in sexual relations. In point of fact, some of the terms specified by the judge as being terms used by the children were not terms used by the children according to the record. Even if they were, however, virtually no type of terminology would be surprising under these circumstances. In this regard, although the trial judge found it difficult to ascertain which words were used by the children and which were used by the interviewers, this court encountered no such problem. The interviewers clearly explained that any words used by the children were placed in quotation marks in their notes.
The trial judge also found that the children were adept at not remembering different things at different times. This finding is also not supported by the record. Although Frankie “did not remember” having sex with his mother during the first two interviews, he never denied it, and in fact seemed to hint at it, saying that “something” must have happened. He finally was willing to talk about it during the final interview at his foster home. Although Frankie did “block things out,” this was, according to his psychiatrist, a part of his diagnosis. In other words, Frankie was “in denial.” Similarly, although Rosemary “minimized” the sexual encounters when she spoke with Dr. Lutz, she did remember having sex with Frankie and later reported essentially the same version, including having sex with Frankie, other siblings and her parents, to Panko-Harris, Detectives Hilliard and Puglia and to her foster mother.
Finally, the trial judge took exception to the methods used to obtain the statements. She found that they were not conducive to reliable results. We observe first that under Wright, leading questions, the lack of videotaping and questions geared to a specific response, are not inappropriate. In any event, leading questions were not used here. When Rosemary was asked by Detective Puglia if she had had sex with her brother, she had already reported that she’d had sex with her brother, and they were going over old ground. Our review of the record simply does not support the trial judge’s finding that the methods used were not reliable. The fact that Puglia did not connect the video monitor to a video recorder does not render the entire interview process unreliable. This is especially true since every interviewer testified that he or she had been taught not to videotape or record children in any way because it was intimidating.
*748 In fact, in holding that children’s statements in such cases need not be videotaped, that leading questions may be used, and that the individual asking the questions may have a preconceived idea of the responses he or she expects, the United States Supreme Court has stated:
Out-of-court statements made by children regarding sexual abuse arise in a wide variety of circumstances, and we do not believe the Constitution imposes a fixed set of procedural prerequisites to the admission of such statements at trial. The procedural requirements identified by the court below, to the extent regarded as conditions precedent to the admission of child hearsay statements in child sexual abuse cases, may in many instances be inappropriate or unnecessary to a determination whether a given statement is sufficiently trustworthy for Confrontation Clause purposes. (Citations omitted.) Although the procedural guidelines propounded by the court below may well enhance the reliability of out-of-court statements of children regarding sexual abuse, we decline to read into the Confrontation Clause a preconceived and artificial litmus test for the procedural propriety of professional interviews in which children make hearsay statements against a defendant.
Wright, 497 U.S. at 818-819, 110 S.Ct. at 3148.
In view of all of the above, we find that the record conclusively demonstrates that there has been a clear abuse of discretion in excluding the child victims’ statements. See Perry v. State, 593 So.2d 620 (Fla. 2d DCA), rev. denied, 602 So.2d 942 (Fla.1992). We reverse and remand, and direct that the children’s statements be admitted in further proceedings.
FRANK, C.J., and FULMER, J., concur.